UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
UNITED STATES OF AMERICA          :
                                  :     **OPINION AND ORDER**
v.                                :
                                  :     24 CR 278 (VB)
VINCENT CANNADY,                  :
                    Defendant.    :
--------------------------------------------------------------x

Briccetti, J.:

On September 16, 2025, after a seven-day jury trial, defendant Vincent Cannady, who had waived his right to counsel and was proceeding pro se, was found guilty of attempted extortion in violation of 18 U.S.C. § 1951.  Beginning that day, Cannady filed twenty-two timely applications for post-trial relief—including requests for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c), for a new trial pursuant to Fed. R. Crim. P. 33, and for an arrest of judgment pursuant to Fed. R. Crim. P. 34.  (Docs. ##403, 405, 409, 410, 411, 412, 413, 414, 416, 417, 418, 419, 420, 421, 422, 424, 425, 426, 429, 430, 431, 434).[1]

On September 22, 2025, the Court directed the government to respond to all of Cannady's post-trial motions made prior to October 1, 2025.  (Doc. #415).[2]  The government responded on October 2, 2025, opposing all of Cannady's motions.  (Doc. #443).  Cannady filed a reply in support of his motions on October 6, 2025.  (Doc. #445).

---

[1]    Cannady styles some of his applications as motions (see, e.g., Doc. #412), and others as objections in which he requests relief (see, e.g., Doc. #422).  In light of Cannady's pro se status, the Court liberally construes Cannady's objections in which he requests relief as motions under Rule 29, Rule 33, or Rule 34.

[2]    Pursuant to Rules 29(c), 33, and 34, Cannady was required to submit all motions requesting relief under those Rules within 14 days of the guilty verdict, which the jury delivered on September 16, 2025.  As such, Cannady's filing deadline for these motions was September 30, 2025.  Cannady filed multiple motions after that deadline, which the Court denied as both untimely and without merit.  (Docs. ##441, 451).

1

For substantially the reasons set forth in the government's opposition, the motions are DENIED.

As a general matter, the Court has previously addressed and rejected most of the arguments that Cannady now advances as challenges to his conviction. Not only does Cannady repeat arguments, but he does so across different motions, requiring the Court to address his claims by topic instead of resolving each motion (or even each ground for relief) individually. Further, many of Cannady's positions are frivolous and the Court need not exhaustively examine them to decide the pending motions.

## DISCUSSION

I.   Jurisdiction

Cannady moves the Court to arrest judgment under Rule 34 because he claims the Court does not have subject matter jurisdiction over this case. (Doc. #429). According to Cannady, the Court lacks jurisdiction because "the underlying conduct was civil, not criminal." (Id. at 2).

Cannady's argument is frivolous. Cannady was charged with, and convicted of, violating a federal criminal statute: 18 U.S.C. § 1951(b). And 18 U.S.C. § 3231 mandates "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." The existence of a separate civil dispute involving some of the same underlying conduct as this case does not deprive this Court of jurisdiction. There is no ground to arrest judgment here.

II.  Alleged Batson Violation

Cannady claims the Court erred in denying his challenge to the assembled jury under Batson v. Kentucky, 476 U.S. 79 (1986). (Docs. ##403, 405). According to Cannady, the

government's use of a peremptory challenge as to an African American potential juror violated his Sixth Amendment right to an impartial jury as articulated by the Supreme Court in <u>Batson</u>. (Doc. #403 at 2–3).

Cannady's <u>Batson</u> argument is baseless and the Court has already decided this issue. Cannady first raised a <u>Batson</u> objection during jury selection on September 8, 2025, when the government peremptorily challenged an African American individual who was one of the 36 qualified jurors. (Voir Dire Tr. at 223–25). In response to Cannady's objection, the government <u>withdrew</u> its challenge of the prospective juror, who subsequently was seated as an alternate juror. (<u>Id</u>.). Nevertheless, that same day Cannady filed a <u>Batson</u> objection to the seated jury. (Doc. #384). The Court denied that application on the record the following morning, September 9, explaining that Cannady's argument was "nonsensical" because the government had in fact withdrawn its challenge. (Trial Tr. at 9).

For the same reason, Cannady's argument is no more successful now. The record is devoid of any indication that the government lodged its challenge for an improper reason. Putting aside the government's withdrawal of its challenge, the challenge of an African American potential juror does not in and of itself create a <u>Batson</u> violation. Instead, the defendant must put forward a <u>prima facie</u> case of purposeful discrimination, which Cannady has failed to do here. <u>Batson v. Kentucky</u>, 476 U.S. at 94–95. As for Cannady's claim that "the government struck all prospective African American jurors from the venire," it is obviously false; none of the other qualified jurors peremptorily struck by the government was an African American and the seated jury was racially diverse—including, as the government noted, one seemingly African American juror. (Doc. #443 at 22 n.4).

3

In addition, Cannady argues the jury pool included an insufficient number of African Americans and that the "exclusion" of African Americans "from the jury venire violated Defendant's Sixth Amendment right to a jury drawn from a fair cross-section of the community." (Doc. #405 at 2). Cannady offers no factual support whatsoever for this argument. Moreover, the Second Circuit has recently upheld this District's jury selection plan. United States v. Slaughter, 110 F.4th 569 (2d Cir. 2024). Cannady does not argue Slaughter was wrongly decided or otherwise engage with the necessary constitutional analysis. The Court therefore rejects his claim as frivolous.

III.     Jurors' Alleged Bias

Cannady claims multiple jurors had "financial conflicts of interest" because they had "financial holdings in IBM/Kyndryl," which should have disqualified them from serving on the jury. (Doc. #416 at 2, 6; see also Doc. #417). Here, Cannady refers to the fact that IBM is the former parent company of the victim in this case, Kyndryl, Inc., although Kyndryl is now a separate entity.

Again, Cannady grossly distorts the record. None of the seated jurors had a financial interest in Kyndryl. A few members of the jury pool owned stock in Kyndryl or otherwise had connections to the company, but the Court excused them all for cause—some upon Cannady's challenge, others sua sponte.

Although one empaneled juror owned stock in IBM, she confidently asserted her stock ownership would not affect her fairness if she were selected on the jury. (Trial Tr. at 101). Cannady did not object to that fact when it was revealed during voir dire, nor did he attempt to strike her during jury selection. As such, he has waived any objection to her inclusion on the jury. Regardless, IBM has no direct involvement in this case. Even though IBM spun off

4

Kyndryl as a separate company, that fact alone was not enough to create a per se conflict of interest for any prospective juror on this case.

Moreover, after the panel of 36 qualified jurors was assembled, Cannady raised only one for-cause challenge—regarding the English fluency of one potential juror. (Trial Tr. at 207). He did not raise a single challenge regarding the financial interests or bias as to any of the qualified prospective jurors.

Cannady also claims the jury was biased against him because certain jurors displayed "observable hostility, including rigid posture upon mention of IBM." (Doc. #417 at 2, 4). Cannady made no such objections or observations during trial and the Court did not observe any behavior indicating juror bias. Such conclusory, post-trial claims are insufficient to warrant relief.

IV.     Requests for Recusal

Cannady claims that the Court's "ownership of IBM/Kyndryl stock, coupled with refusal to recuse," violated his due process rights and 28 U.S.C. § 455. (Doc. #416 at 5). Cannady has raised this baseless allegation in at least half a dozen motions over the course of this case, and the Court will not revisit this issue. As it has explained, the Court has no financial interest in IBM. Rather, it has investments in mutual funds managed by Vanguard, and "investment in a mutual fund does not convey an ownership interest in the companies whose stock the fund holds." U.S. Courts, Guide to Judiciary Policy, Vol. 2B, Ch. 2, Committee on Codes of Conduct Advisory Opinion No. 106 (March 2011). (See Doc. #140). The Court has properly rejected Cannady's requests for recusal.

V.        Evidence of Settlement Negotiations

Cannady argues the Court erred by receiving in evidence at trial emails that he sent to employees of Manpower, Inc. ("Manpower"), and Kyndryl after the termination of his contract with Kyndryl in June 2023. (Docs. ##405, 410, 420, 421, 422). Specifically, Cannady contends these emails were confidential settlement communications and therefore inadmissible pursuant to Fed. R. Evid. 408. (Doc. #410 at 3).

The Court has repeatedly observed that Cannady misstates the scope of Rule 408. (Docs. ##62; 171 at Tr. 15–18; 298). As the Court held on August 11, 2025, "Rule 408 of the Federal Rules of Evidence does not preclude the introduction of evidence of settlement negotiations when relevant to the underlying conduct in a specific case." (Doc. #298). Instead, the Rule bars admission of settlement negotiations "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." In other words, Rule 408 prohibits the admission of settlement negotiations to bolster or attack the merits of an underlying claim—<u>not</u> as evidence of criminal conduct in a separate case, as occurred here.

VI.       Jury Charge

Cannady argues the Court violated his due process rights by incorrectly instructing the jury on the standard for proving an effect on interstate commerce. (Docs. ##425, 426). The Court instructed the jury that "[t]he government only needs to prove a very slight or subtle actual or potential effect on commerce. The actual or potential effect on commerce can be minimal." (Trial Tr. at 1218). According to Cannady, "[t]his instruction impermissibly lowered the government's burden of proof and effectively rewrote" 18 U.S.C. § 1951(b) (Doc. #425 at 4), which requires proof of "an actual effect" on interstate commerce. (Doc. #426 at 2).

6

Cannady is incorrect.  "'[T]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce.  Even a potential or subtle effect will suffice.'"  United States v. Wilkerson, 361 F.3d 717, 726 (2d Cir. 2004) (quoting United States v. Angelilli, 660 F.2d 23, 35 (2d Cir. 1981)).  The government was not required to prove an actual impact on interstate commerce.  Indeed, in his request to charge, Cannady urged the Court to instruct the jury that the interstate commerce element "is usually satisfied if the alleged victim is an entity engaged in interstate commerce or the threatened harm implicates such commerce."  (Doc. #284–1 at 4) (emphasis added).  Cannady's about-face on this issue is unavailing.

VII.  Sufficiency of the Evidence

Cannady seeks to overturn the jury's verdict and enter a judgment of acquittal, arguing the government introduced insufficient evidence to sustain his conviction.  (Docs. ##405, 425, 426).

To obtain a judgment of acquittal under Rule 29(c), a defendant "must show such grave problems with the prosecution's case that 'no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.'"  United States v. Reese, 2025 WL 1770789, at *2 (S.D.N.Y. June 25, 2025) (quoting United States v. Caracappa, 614 F.3d 30, 43 (2d Cir. 2010)).  In reviewing a defendant's Rule 29(c) motion, the Court "must 'review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'"  Id. (quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999)).

Simply put, the evidence introduced against Cannady was overwhelming.  First, Cannady argues there was insufficient evidence to prove an actual or potential effect on interstate

7

commerce. But the jury was presented with evidence showing Cannady's conduct affected or could have affected commerce between states or between a state and another country. Kyndryl is a public company headquartered in New York City—specifically, Manhattan—that does business around the world. (Trial Tr. at 65–66, 144, 207). Multiple witnesses testified that Cannady's threats to publicize the confidential cybersecurity files endangered the company's reputation and business relationships with its clients. (Trial Tr. at 77, 105–06, 116–17, 299).

Second, Cannady contends the evidence "failed to establish that Mr. Cannady acted 'knowingly and willfully' with criminal intent." (Doc. #425 at 5). That position is contradicted by a wealth of evidence introduced at trial. For example, Cannady sent an email to Kyndryl and Manpower employees acknowledging the impact that releasing Kyndryl's files would have on the company. (See Doc. GX-229: "As we all know those documents will imperil Kyndryl's reputation and shake investor confidence."). He also demanded funds from Kyndryl as payment for his destruction of those very same files. (See, e.g., GX-304: writing that $1.5 million dollars would "buy a[n] attestation of all files destroyed by me"; GX-309: "I am not a fool why would I destroy my only leverage with out a monetary agreement."). Cannady's intent to hold the files until Kyndryl paid him for their destruction was obvious from his own email communications, which he never disclaimed at trial.

Third, Cannady argues the jury viewed insufficient evidence demonstrating that venue properly lay in the Southern District. According to him, "[n]o evidence showed that Mr. Cannady ever sent, directed, or transmitted any communication to anyone in the Southern District of New York," which he says means there was insufficient evidence to satisfy the element of venue at trial. (Doc. #424 at 1). Cannady maintains he sent every communication

8

introduced at trial while residing in Missouri and none of the recipients worked in or resided in the Southern District.

Cannady's request is meritless because there is more than sufficient evidence in the trial record to prove venue by a preponderance of the evidence—the necessary standard in a criminal trial. United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005). When a crime occurs across multiple locations, "venue is properly laid in any of the districts where an essential conduct element of the crime took place." Id. Crucially, when a crime is charged under the Hobbs Act, like here, venue "is proper in any district where interstate commerce is affected or where the alleged acts took place." United States v. Menendez, 2025 WL 2166135, at *21 (S.D.N.Y. 2025) (quoting United States v. Stephenson, 895 F.2d 867, 875 (2d Cir. 1990)).

Here, the government introduced evidence showing Cannady attempted to extort Kyndryl, which is headquartered in Manhattan, in the Southern District of New York. One of the Kyndryl email recipients, William H. Brennan, testified he discussed Cannady's emails with two company lawyers. (Trial Tr. at 119, 127). Another witness, Jeff Whitehill, testified that those two lawyers, as well as the rest of Kyndryl's legal department, worked out of an office in Rye Brook, New York, in Westchester County, which is also in the Southern District. (Trial Tr. at 550–52). Further, in one email sent to Brennan and other Kyndryl executives, Cannady "suggest[ed]" that Kyndryl's lawyers respond to his email. (GX 227).

Essentially, the government presented sufficient evidence that (i) Cannady attempted to extort a company headquartered in the Southern District, and that (ii) the emails he sent in that attempt reached employees who worked in the Southern District. As discussed above, there is ample evidence to establish a potential or actual impact on interstate commerce. As such there is enough evidence to establish venue, especially under the lower preponderance of the evidence

standard. The fact that Cannady sent the emails while residing in Missouri does not eliminate the effect of his actions in the Southern District of New York.

VIII.  Alleged Altered or Unauthenticated Emails

Cannady contends the email evidence introduced against him should have been excluded because the emails (i) were not properly authenticated and (ii) were "edited and altered." (Doc. #418 at 1; see also Docs. ##405, 414). According to Cannady, "the Government introduced emails that I and at least two other witnesses testified we did not recognize as emails we sent or received." (Doc. #418 at 2). He also claims that, in June 2024, "Kyndryl obtained access to my Yahoo email account" and "[f]ollowing this access, numerous emails in my account were either deleted, edited, or altered." (Id.).

This position is baseless. Although Cannady occasionally objected to the authenticity of emails the government introduced at trial, he offered no basis for that objection then—nor does he offer any now. (See, e.g., Trial Tr. at 566). As required under Fed. R. Evid. 901, the government produced "evidence sufficient to support a finding that" that the proffered emails were what the government claimed them to be—typically via testimony of a witness with knowledge of the email. Fed. R. Evid. 901(a), (b)(1). Cannady is correct that some witnesses did not recognize emails placed in front of them, but those exchanges occurred only when the witnesses were presented with emails they had not seen before. (See, e.g., Trial Tr. at 970).

Moreover, Cannady's allegation of evidence tampering is devoid of factual support. As he has done countless times throughout this case, Cannady advances a baseless claim of misconduct supported only by his own conclusory statements. The Court need not engage with this allegation any further.

IX.     Alleged Collusion Between the Government and Kyndryl and Manpower

Cannady claims the government impermissibly colluded with Kyndryl and Manpower in prosecuting him.  (Doc. #420).

This allegation, like Cannady's other claims of government misconduct, is unfounded. First, Cannady did not raise this argument before or during trial (despite accusing the government of a wide array of other misconduct).  Second, it is entirely appropriate for the victim in any criminal case to interact with the government, and it is equally appropriate for the government to consider the victim's interests when prosecuting a case.  Kyndryl is the victim here, so contact between the company (or its employees or counsel) and the government is not improper.  Third, the government did not act as a mouthpiece for either Kyndryl or Manpower. As interested non-parties, both companies advocated through counsel for their own interests when necessary.  (See, e.g., Docs. ##355, 368).  Finally, Sylvester ("Sly") James's testimony that Kyndryl and Manpower "were apparently joined at the hip" when negotiating with Cannady to retrieve Kyndryl's confidential cybersecurity files does not demonstrate either company was equally as enmeshed with the government.  (Trial Tr. at 955).

X.     Motions to Quash Subpoenas

Cannady argues the Court violated his Sixth Amendment guarantee of compulsory process by quashing testimonial and document subpoenas he issued to seventeen non-parties in advance of trial.  (Docs. ##413, 414).  He claims the Court's Orders "materially prejudiced the defense by excluding testimony and documents central to rebutting the Government's case." (Doc. #413 at 1).

First, Cannady asserts the Court granted motions to quash filed by non-parties who in fact did not file any motions to quash in this case:  Zachary Wiseman, Keith Lein, someone

11

Cannady identifies as "Dr. Kresta," Laurel Stevenson,[3] the Securities and Exchange Commission ("SEC"), the Federal Reserve, Delta Airlines,[4] Yahoo, Verizon, and Bank of America. Because the Court did not resolve any motions to quash filed by the aforementioned parties, Cannady's application in this regard is meritless.

Second, Cannady withdrew the subpoenas he issued to Barbara Farrell and Roxana Cook, so the Court never granted their motions to quash; rather, it denied their motions as moot. (Docs. ##374, 401). Similarly, CrowdStrike never filed a motion to quash; instead, Cannady filed a motion to compel production from CrowdStrike, which the Court denied as moot after Cannady stated on the record that he accepted the limited document production provided by the company. (Doc. #401; Trial Tr. at 762–63).

Third, none of the motions to quash that the Court did grant—those filed by Troy Coody, Mark Berman, Mara Rose Williams, Microsoft, and Kyndryl—was a close call. Berman and Williams are reporters whom Cannady copied on hundreds of emails related to this case and had no knowledge about the charged conduct. (Doc. #358). Although Coody overlapped with Cannady briefly at Kyndryl, he was not involved in the termination of Cannady's contract or the subsequent negotiations over the confidential files. Accordingly, the Court granted his motion to quash because his testimony would have little, if any, probative value. (Doc. #401; Trial Tr. at 493–96). Microsoft's motion was meritorious because the company was barred by the Stored

---

[3]   The government writes in its opposition that Ms. Stevenson filed a motion to quash a trial subpoena in the Western District of Missouri. (Doc. #443 at 39–40). The Court became aware of this motion only when Cannady withdrew his subpoena to Stevenson on the record at trial. (Trial Tr. at 473).

[4]   Cannady identifies this party only as "Delta" but, from the context of the record, the Court understands him to refer to Delta Airlines. (Doc. #413 at 1).

Communications Act from producing the documents listed in Cannady's subpoena to the company. (Doc. #401; Trial Tr. at 936–38). As for Kyndryl, the Court determined Cannady's subpoena to the company was "defective because it's grossly overbroad" and "a fishing expedition." (Trial Tr. at 378–79). Even so, Kyndryl still engaged with Cannady in good faith and produced a smaller subset of documents; the Court granted the company's motion to quash only after Cannady failed to demonstrate why the remaining documents he sought were relevant to the trial proceedings. (Doc. #401; Trial Tr. at 382).[5]

### XI. Barbara Farrell

Cannady claims the Court violated his "Fifth and Sixth Amendment rights to present a complete defense" when it denied his motion to call Barbara Farrell as an expert witness to explain his "mental state, cognitive impairments, and their effect on specific intent." (Doc. #405 at 3; see also Docs. ##412, 414).

The Court denied Cannady's motion to call Farrell as an expert witness in a pre-trial ruling issued on September 4, 2025 (Doc. #359), and Cannady identifies no reason to reconsider that decision. Cannady's motion was denied as untimely and his reason for that delay, an alleged breakdown in communication with his standby counsel, was the result of Cannady's own behavior. In addition, Cannady's stated purpose in calling Farrell—to provide an expert opinion about the effect of his mental health challenges on his criminal intent—violates Fed. R. Evid. 704's prohibition on expert witness testimony that "state[s] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime

---

[5] It should be noted that the Court did not grant every motion to quash filed by witnesses subpoenaed by Cannady. Rather, the Court decided several such motions in Cannady's favor.

charged or of a defense." Fed. R. Evid. 704(b).  The Court properly denied his motion to call Farrell as an expert witness.

Cannady ignores Rule 704 entirely in his post-trial motions and instead reiterates arguments he made, and that the Court rejected, before trial.  The Court is not persuaded.

XII.    Ineffective Assistance of Standby Counsel

Finally, Cannady argues he received ineffective assistance from Daniel A. Hochheiser, Esq., standby counsel in this case.  (Doc. #430).  He claims Mr. Hochheiser "failed to issue multiple essential subpoenas" on Cannady's behalf, "mishandl[ed]" trial exhibits, and "failed to inform Mr. Cannady—who is legally blind—that only one Black juror remained in the selection pool until it was too late to challenge the panel or exercise peremptory strikes."  (Id. at 3–5).

Cannady's argument fails because, as the Court reminded Cannady countless times throughout this case, he waived any claims of ineffective assistance of counsel by waiving his right to counsel and proceeding pro se.  (See, e.g., Doc. #163 at Tr. 43).  "Absent a constitutional right to standby counsel, a defendant generally cannot prove standby counsel was ineffective." United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997).  Neither the Supreme Court nor the Second Circuit has recognized a constitutional right to effective assistance of standby counsel. United States v. Lewis, 818 F. App'x 74, 78 (2d Cir. 2020).

The only potential exception to the bar on pro se defendants raising claims of ineffective assistance against standby counsel is in cases in which standby counsel has "acted as the defendant's lawyer throughout the proceedings."  United States v. Archambault, 740 F. App'x 195, 199 (2d Cir. 2018) (quoting United States v. Schmidt, 105 F.3d at 90).  That does not apply here, however.  Cannady insisted throughout the pendency of this case that he represent himself completely.  Cannady gave opening and closing statements, examined all witnesses, and

14

argued motions before the Court. Mr. Hochheiser never acted as Cannady's lawyer. He acted solely as standby counsel and provided exemplary service in that role. Indeed, based on Mr. Hochheiser's credible representations to the Court and the Court's own observations, Mr. Hochheiser largely assisted in administrative tasks—and even then only with Cannady's express permission. (See, e.g., Trial Tr. at 474). Cannady represented himself at trial and he now must suffer the consequences of his lack of legal education and experience.

XIII.   Additional Arguments

To the extent Cannady advances any additional arguments, they are meritless. Cannady has repeatedly attempted to obstruct the orderly administration of this case by filing frivolous motions containing outright fabrications, and he has done so here once again. The Court will not allow Cannady to delay his sentencing by engaging in an endless back and forth over nonsensical arguments.

XIV.   Summary

At bottom, there is no reason whatsoever to disturb the jury's verdict. As discussed, the government's evidence was overwhelming. Cannady made repeated extortionate threats to Manpower and Kyndryl, all via emails that the jury viewed. In those emails he threatened to ruin Kyndryl's reputation by releasing the confidential files he wrongfully obtained unless the company paid him. Cannady did not contest those communications at trial but instead argued they were simply permissible settlement negotiations. The jury rejected that theory, and Cannady's misstatements and inapposite legal theories present no reason to set aside his conviction.

Nor has Cannady demonstrated that a new trial is warranted. The Court is confident that letting the guilty verdict stand would not "be a manifest injustice" and it has no concern

whatsoever that "an innocent person may have been convicted." United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013). Rather than avail himself of the able assistance of counsel, Cannady chose to represent himself, present irrelevant arguments to the jury, and call witnesses who actually harmed his case. Even so, Cannady had a full and fair opportunity to challenge the government's mountain of evidence and present his defense. His conviction is just.

## CONCLUSION

Accordingly, Cannady's applications for a judgment of acquittal under Rule 29(c) are DENIED; Cannady's applications for a new trial under Rule 33 are DENIED; and Cannady's applications for an arrest of judgment under Rule 34 are DENIED.

Standby counsel is directed to provide a copy of this Opinion and Order to defendant by email.

Dated: October 9, 2025
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge